United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 17, 2007**

Charles R. Fulbruge III
Clerk

REVISED SEPTEMBER 13, 2007

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-50754

_____

STATE OF TEXAS,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT
OF THE INTERIOR; DIRK KEMPTHORNE, in his Official Capacity
as Secretary of the Department of the Interior,

Defendants-Appellees,

KICKAPOO TRADITIONAL TRIBE OF TEXAS,

Intervenor-Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before JONES, Chief Judge, and KING and DENNIS, Circuit Judges.

EDITH H. JONES, Chief Judge:

This is high-stakes litigation involving a challenge to procedures adopted by the Secretary of the Interior Department ("Secretary") to circumvent the consequences of the Supreme Court's Eleventh Amendment decision in <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44, 116 S. Ct. 1114 (1996). An initial question is whether Texas's challenge to the existence of the Secretarial Procedures is ripe now, before the Secretary has made a substantive

determination on a tribe's Class III gaming license. We hold that the case is ripe, the State has standing, and the Secretary lacked authority to promulgate the regulations. The district court's judgment is REVERSED and REMANDED.

## I. BACKGROUND

In the 1980s, various Indian tribes began to seek authority for legalized gambling as a way to earn revenue. As sovereigns, Indian tribes are subordinate only to the federal government. California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207, 107 S. Ct. 1083, 1087 (1987). State laws, however, "may be applied to tribal Indians on their reservations if Congress has expressly so provided." Id. In Cabazon, the Supreme Court held that because Congress had not so expressly provided, California could not enforce certain anti-gambling laws against an Indian tribe there. Id. at 214, 221-22, 107 S. Ct. at 1091, 1094-95.

In response to Cabazon, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 et seq., to give states a subordinate but significant role in regulating tribal gaming. IGRA separates gaming into classes of escalating stakes. Class I gaming – social games played for minimal value – is within the exclusive jurisdiction of the tribes. 25 U.S.C. §§ 2703(6), 2710(a)(1). Class II gaming – bingo and related activities – is subject to oversight by the National Indian Gaming Commission.

2

25 U.S.C. §§ 2703(7), 2706(b), 2710(a), (b) & (c). All other forms of gaming, including high-stakes games such as slot machines, casino games, lotteries, and dog racing, are Class III. 25 U.S.C. § 2703(8).

Class III gaming, if authorized by the tribe, must be "conducted in conformance with a Tribal-State compact entered into by the Indian Tribe and the State." 25 U.S.C. § 2710(d)(1). In IGRA, Congress meticulously detailed two separate tracks leading to the institution of a Class III tribal gaming business. On the first track, the tribe and the state may negotiate a voluntary compact governing the conduct of gaming activities, which takes effect essentially upon approval by the Secretary. § 2710(d)(3)(B).

The second track begins when no compact has been reached one hundred eighty days after the tribe requests negotiations. IGRA then allows a tribe to file suit against the state in federal court and seek a determination whether the state negotiated in good faith. § 2710(d)(7). If the court finds the state negotiated in good faith, the tribe's proposal fails. On a finding of lack of good faith, however, the court may order negotiation, then mediation. If the state ultimately rejects a court-appointed mediator's proposal, the Secretary "shall prescribe, in consultation with the Indian tribe, procedures . . . under which class III gaming may be conducted." § 2710(d)(7)(B).

The Supreme Court held this second track of the congressional scheme flawed under the Eleventh Amendment, because Congress has no authority to abrogate a state's sovereign immunity from suit under the Indian Commerce Clause of Article I of the Constitution. See Seminole Tribe, 517 U.S. at 47, 116 S. Ct. at 1119. Following Seminole Tribe, a state may waive immunity from suit, or the United States may sue the state to obtain the statutory good-faith determination, but a state cannot be forced to submit to the tribe's suit. Seminole Tribe made the second track toward Class III gaming far more difficult to pursue.

To work around the decision, the Secretary promulgated notice-and-comment regulations in 1999. See Class III Gaming Procedures, 25 C.F.R. pt. 291 ("Secretarial Procedures" or "Procedures"). The Secretarial Procedures only apply if the state asserts its sovereign immunity and refuses to consent to a tribe's statutory good-faith suit. 25 C.F.R. §§ 291.1(b), 291.3. In such event, an eligible tribe may submit a Class III gaming proposal to the Secretary, who then affords the state sixty days to comment and submit an alternative proposal. 25 C.F.R. § 291.7. At that point, the Secretarial Procedures prescribe two tracks depending on whether the state chooses to submit an alternative compact proposal.

If the state does not submit an alternative proposal, the Secretary reviews the tribe's proposal and either approves it or offers the opportunity for a conference between the state and the

4

tribe to address "unresolved issues and areas of disagreements in the proposal." 25 C.F.R. § 291.8. The Secretary must then make a "final decision either setting forth the Secretary's proposed Class III gaming procedures for the Indian tribe, or disapproving the proposal." Id.

If the state submits an alternative plan, the Secretary appoints a mediator who, following the same procedures as IGRA prescribes, will resolve differences between the two proposals. 25 C.F.R. §§ 291.9, 291.10. While, under the Procedures, the Secretary may reject the mediator's proposal, he "must prescribe appropriate procedures within 60 days under which Class III gaming may take place." 25 C.F.R. § 291.11 (emphasis added).

The difference between IGRA and the Secretarial Procedures is that IGRA compels appointment of a mediator by the court only after a judicial finding that the state failed to negotiate in good faith, but under the Secretarial Procedures, the gaming proposal goes forward without any judicial bad-faith determination if the state refuses to waive sovereign immunity. The Secretarial Procedures, in sum, offer two alternatives for a state that insists upon its sovereign immunity: refuse to negotiate, participate (or not) in an informal conference, and take a chance that the Secretary will not accept the tribe's Class III gaming proposal, 25 C.F.R. § 291.8; or submit its "last best proposal" to a mediator, with the certainty that Class III gaming

5

must be approved on the mediator's or the Secretary's terms. 25 C.F.R. § 291.11.

In 1995, the Kickapoo Traditional Tribe of Texas (the "Kickapoo") petitioned the State to enter into a compact facilitating Class III gaming on its land. Texas rejected the Kickapoos' offer. The tribe's federal lawsuit against Texas was eventually dismissed under Seminole Tribe. In 2004, the Kickapoo submitted a proposal to the Secretary, who followed the Secretarial Procedures and invited Texas to comment. Texas responded with this lawsuit asking the court to declare the Secretarial Procedures unauthorized and unconstitutional.

## II. STANDARDS OF REVIEW

This court reviews a district court's legal conclusions, including the decision whether to grant a summary judgment motion, de novo. Garcia v. LumaCorp, Inc., 429 F.3d 549, 553 (5th Cir. 2005). Jurisdictional issues such as ripeness and standing, as well as questions of statutory interpretation, are also legal questions for which review is de novo. See Bonds v. Tandy, 457 F.3d 409, 411 (5th Cir. 2006) (standing); Groome Res. Ltd., L.L.C., v. Parish of Jefferson, 234 F.3d 192, 198-99 (5th Cir. 2000) (ripeness); In re Reed, 405 F.3d 338, 340 (5th Cir. 2005) (statutory interpretation). A district court's factual findings, including those on which the court based its legal conclusions, are

6

reviewed for clear error.  See Rivera v. Wyeth-Ayerst Labs.,
283 F.3d 315, 319 (5th Cir. 2002).

## III.  DISCUSSION

The district court determined in a thoughtful opinion
that Texas had standing to sue, but that the State's claims were
not ripe for adjudication.  See Order on Defendants' Motion to
Dismiss, Kickapoo Traditional Tribe of Texas v. State of Texas,
Cause No. P-95-CA-66 (W.D. Tex. Apr. 2, 1996).  The court thus
dismissed.  Nevertheless, it also opined that the Secretary had
implied authority under IGRA and his general statutory
responsibility for Indian tribes to promulgate the Procedures.
Texas v. United States, 362 F. Supp. 2d. 765, 769-70 (W.D. Tex.
2004).  The State appealed.  Responding to the parties' contentions
in this court, we conclude that Texas has standing to sue, that its
case is ripe, and that the Secretarial Procedures are unauthorized
by statute.

## A.  Justiciability

Appellees first contend that Texas has no standing to
seek invalidation of the Secretarial Regulations because Texas has
suffered no injury from the mere existence of the Secretarial
Procedures and, in any event, Texas brought any injury on itself by
raising a sovereign immunity defense to the Kickapoo Tribe's
enforcement suit.  Relatedly, Appellees argue that Texas's claims
are not ripe because any injury that Texas could suffer from the

7

Procedures would only manifest if the Secretary were to prescribe gaming procedures for the tribe at some point in the future. We disagree with each contention.

The standing and ripeness doctrines flow largely from Article III of the Constitution, which limits the federal judicial power to the resolution of cases and controversies. Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S. Ct. 752, 757-58 (1982) (discussing the underpinnings of standing doctrine). In general terms, standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time. See Elend v. Basham, 471 F.3d 1199, 1205 (11th Cir. 2006). However, the doctrines often overlap in practice, particularly in an examination of whether a plaintiff has suffered a concrete injury, see id. at 1205, and our injury-in-fact analysis draws on precedent for both doctrines.

## 1. Standing

"The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'" Flast v. Cohen, 392 U.S. 83, 99, 88 S. Ct. 1942, 1952 (1968) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S. Ct. 691, 703

8

(1962)). To meet the constitutional standing requirements, (1) the plaintiff must have suffered an "injury in fact," defined as an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the challenged action of the defendant; and (3) it must be likely, not merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992). Texas, as the party invoking federal jurisdiction, bears the burden of establishing that the standing requirements are met. See id. at 561, 112 S. Ct. at 2136.

Texas alleges two ways in which the Secretarial Procedures have caused it to suffer an injury in fact, contending first that the existence of the Secretarial Procedures has reduced the state's bargaining power relative to that of the Kickapoo,[1] and second that the Secretarial Procedures subject Texas to a process for approval of Class III gaming that omits IGRA's procedural safeguards and thus exceeds the Secretary's regulatory authority. The latter argument, in other words, is that Texas has suffered the

---

[1] While the Supreme Court has held that the denial of a "statutory bargaining chip" can "inflict[] a sufficient likelihood of economic injury to establish standing," Clinton v. City of New York, 524 U.S. 417, 432, 118 S. Ct. 2091, 2101 (1998), it is unclear whether a reduction in bargaining power unaccompanied by economic injury or other concrete injury can constitute an injury in fact. We do not reach this issue because Texas's other alleged injury in fact is sufficient to support standing.

9

injury of being compelled to participate in an invalid administrative process, and we agree that standing exists on this basis.

At the outset of IGRA's enforcement process, the statute provides for tribe-initiated court review of a state's good faith. Once a tribe makes a prima facie showing, the state has the opportunity to prove its good faith to the court and forestall the remainder of the enforcement process, which includes court-ordered mediation and possible secretarial approval of gaming procedures. Texas interprets this as a statutory promise that states will be spared mediation and secretarial action unless a court has determined that the state negotiated in bad faith.

Contrary to Appellees' suggestion that Texas faces nothing more than the possibility that the Secretary might someday approve of gaming procedures for Kickapoo land, Texas is presently being subjected to an administrative process involving mediation and secretarial approval of gaming procedures even though no court has found that Texas negotiated in bad faith. Because Texas challenges the Secretary's authority to undertake this process, Texas has alleged a sufficient injury for standing purposes. Cf. Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580, 105 S. Ct. 3325, 3332 (1985) (holding that a challenge to a statutory system of arbitration was ripe because the plaintiffs' "injury [was] not a function of whether the [arbitration] tribunal awards reasonable compensation but of the tribunal's authority to adjudicate the dispute"); Middle S. Energy Inc. v. Ark. Pub. Serv.

10

Comm'n, 772 F.2d 404, 410 (8th Cir. 1985) (challenge to a state agency's ongoing proceedings was ripe because the plaintiff "challenge[d] not the state's ultimate substantive decision but its authority to even conduct the contemplated proceeding"). The alleged injury is not hypothetical because the Secretarial Procedures have already been applied to Texas: The Kickapoo Tribe submitted a Class III gaming application to the Department of the Interior, the Secretary notified Texas and the tribe that the application met the relevant eligibility requirements, and the Secretary invited Texas to comment on the proposal and submit an alternative proposal.[2] Texas's only alternative to participating in this allegedly invalid process is to forfeit its sole opportunity to comment upon Kickapoo gaming regulations, a forced choice that is itself sufficient to support standing. See Union Carbide, 473 U.S. at 582, 105 S. Ct. at 3333 (recognizing "the injury of

---

[2]     In accordance with the Secretarial Procedures, the Department of the Interior informed the Kickapoo that their proposal was completed on December 11, 2003. See 25 C.F.R. § 291.6(b). On May 24, 2007, the Secretary issued a preliminary "scope-of-gaming decision" in response to the tribe's proposal. According to the Secretary,

> [t]he Tribe should be authorized to engage in the following gaming activities under Class III procedures pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii)(I), subject to the requirements discussed in [the scope-of-gaming decision]: (1) traditional casino-style games; (2) any lottery game including keno, numbers and lotto; and (3) off-track pari-mutuel betting and pari-mutuel betting through simulcasting on any gaming activity occurring off Tribal lands. The Tribe is not authorized to operate gaming machines.

This recent, preliminary scope-of-gaming decision illustrates the concrete impact of the choice that the Secretarial Procedures had forced Texas to make, as Texas's decision to forgo this allegedly invalid process has left it unable to influence important decisions such as the type of gaming activities that the Secretary will allow on Kickapoo land.

11

being forced to choose between relinquishing [the benefit of an unlawful adjudicatory process] . . . or engaging in an unconstitutional adjudication"). As the Supreme Court observed in <u>Lujan</u>,

> [w]hen the suit is one challenging the legality of government action or inaction . . . [and] the plaintiff is himself an object of the action (or forgone action) at issue . . . , there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

504 U.S. at 561-62, 112 S. Ct. at 2137. We are satisfied that Texas has alleged an injury in this case.

The causation and redressability requirements for standing are satisfied as well. The injury that Texas claims is directly traceable to the Secretary's applying the Secretarial Procedures to Texas, and a judicial invalidation of the Secretarial Procedures would give Texas direct relief from being effectively forced to participate in this process. Although the United States argues that Texas brought the injury on itself by invoking a sovereign immunity defense, it provides no support for the proposition that an injury cannot be fairly traceable to a defendant if the plaintiff's acts motivated the defendant to undertake its injurious acts. The State did not cause the Secretary of the Interior to promulgate the Secretarial Procedures, nor did it cause the Secretary to apply the process to Texas. The State's sovereign immunity defense is a prerequisite to secretarial action only because the Secretarial Procedures so provide.

12

Accordingly, Texas has standing to challenge the validity of the Secretarial Procedures.

## 2. Ripeness

> [The] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 97 S. Ct. 980 (1977). To determine if a case is ripe for adjudication, a court must evaluate (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. See id. at 149. The fitness and hardship prongs must be balanced, Am. Forest & Paper Ass'n v. EPA, 137 F.3d 291, 296 (5th Cir. 1998), and "[a] case is generally ripe if any remaining questions are purely legal ones." New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 833 F.2d 583, 587 (5th Cir. 1987). Yet "even where an issue presents purely legal questions, the plaintiff must show some hardship in order to

13

establish ripeness."[3]  Cent. & Sw. Servs. v. EPA, 220 F.3d 683, 590 (5th Cir. 2000).

A challenge to administrative regulations is fit for review if (1) the questions presented are "purely legal one[s]," (2) the challenged regulations constitute "final agency action," and (3) further factual development would not "significantly advance [the court's] ability to deal with the legal issues presented."  Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 812, 123 S. Ct. 2026, 2032 (2003) (internal quotation marks and citations omitted); Abbott Labs., 387 U.S. at 149-54, 87 S. Ct. 1515-18.  An additional consideration is "whether resolution of the issues will foster effective administration of the statute."  Merchs. Fast Motor Lines, Inc. v. ICC, 5 F.3d 911, 920 (5th Cir. 1993); Abbott Labs., 387 U.S. at 154, 87 S. Ct. at 1518.

Appellees do not dispute that the issues involved in this case are purely legal, but their arguments with regard to the remaining fitness principles are all based on the mistaken belief that Texas's alleged injury is the speculative harm that could result if the Secretary were ultimately to approve gaming procedures for Kickapoo land.  As discussed in the standing

---

[3]    Texas relies on a case from another circuit for the proposition that hardship is an issue only if a case is not fit for review.  See Fla. Power & Light v. EPA, 145 F.3d 1414, 1421 (D.C. Cir. 1998) ("When a challenged decision is not 'fit' for review, the petitioner must show 'hardship' in order to overcome a claim of lack of ripeness.").  We need not explore this contention here.

14

inquiry, this is incorrect, as Texas claims present injury from submission to an invalid agency process, regardless whether the Secretary ultimately allows gaming on Kickapoo land.

With this distinction in mind, Texas's claims are fit for adjudication. The challenged Secretarial Procedures are a "final agency action," as they are final rules that were promulgated through a formal, notice-and-comment rulemaking process after announcement in the *Federal Register*. See Abbott Labs., 387 U.S. at 150-51, 87 S. Ct. at 1516-17. Additional fact-finding would not aid our inquiry into the purely legal question of their validity. And resolution of this issue now will give both the Secretary and Congress significant guidance into how IGRA's provisions may be administered in the particular situation addressed in this case. Appellees submit no relevant arguments as to why this issue is not presently fit for judicial resolution.

We also agree with Texas that it would suffer hardship if we were to withhold consideration of its claims. The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being "force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences." Oh. Forestry Ass'n v. Sierra Club, 523 U.S 726, 734, 118 S. Ct. 1671 (1998). Texas faces this third type of harm. If Texas cannot challenge the Procedures in this

15

lawsuit, the State is forced to choose one of two undesirable options:  participate in an allegedly invalid process that eliminates a procedural safeguard promised by Congress, or eschew the process with the hope of invalidating it in the future, which risks the approval of gaming procedures in which the state had no input.  See Abbott Labs., 387 U.S. at 152, 87 S. Ct. at 1517 (finding hardship where administrative regulations forced the plaintiffs either to comply with a challenged requirement and incur significant costs or refuse to comply and risk prosecution); cf. Union Carbide, 473 U.S. at 581, 105 S. Ct. at 3333 (finding hardship where the plaintiffs "suffer[ed] the continuing uncertainty and expense of depending for compensation on a process whose authority is undermined because its constitutionality is in question").

We therefore agree with Texas that its challenge to the Secretarial Regulations is ripe for adjudication.

## B.  Merits

On the merits, to which we now turn, Texas contends that the Procedures violate the constitutional separation of powers and nondelegation doctrines and are contrary to and unauthorized by IGRA or any other federal statute.  To avoid resolution of any constitutional issues, it is sufficient to consider whether the Procedures are authorized by IGRA or the general Indian trust statutes under the Chevron test.

16

### 1. Statutory Background

To put this dispute in clearer perspective, one must recall that although states have no constitutional authority over Indian reservations, Congress had consistently authorized states to regulate or prohibit certain activities on the reservations. The Supreme Court significantly altered the assumed state-tribal relationship when, in the 1987 Cabazon Band decision, it expansively interpreted a federal statute to prevent states from prohibiting certain tribal gambling activities.

Congress responded to Cabazon Band by finishing work on IGRA, a gambling-enabling statute for Indian reservations that had been pending in the legislative process for several years. It is unnecessary to repeat our previous summary of the statute's complex provisions. Suffice it to say that among those provisions is a "carefully crafted and intricate remedial scheme"[4] whereby, if a tribe and state do not voluntarily enter a compact for Class III gaming, the principal alternative is for the tribe to sue the state in federal court and secure a determination that the state had not negotiated in good faith.[5] 25 U.S.C. § 2710(d)(7)(A)(i). What constitutes good-faith negotiating by the state is left unexplained. An easy, minimal inference is that a state's

---

[4]    Seminole Tribe, 517 U.S. at 73-74, 116 S. Ct. at 1132.

[5]    Even after Seminole Tribe, the federal government may sue a state on behalf of a tribe to pursue IGRA's remedial process without jurisdictional impediment.

17

insistence upon its general policy against legalized Class III gambling would constitute "good faith," but that determination, along with numerous other issues such as the necessary "fit" between a state's policy and the scope of Class III gaming sought by a tribe, is left to a federal court — a clearly neutral forum. Under IGRA, a federal court finding that the state negotiated in good faith ends the bargaining process. On a finding of lack of good faith, however, the court may order negotiation, § 2710(d)(7)(B)(iii), then mediation. § 2710(d)(7)(B)(iv). The <u>court</u> appoints a mediator. If a state refuses to consent to the mediator's proposed compact (which must blend the "last best offers" of each party), the Secretary is then authorized to prescribe procedures that will bind the state. Moreover, the Secretary must adopt procedures "consistent with the [mediator's] proposed compact . . . ." § 2710(d)(7)(B)(vii)(I). This statutory balance on its face cabins the Secretary's authority while implanting neutral factfinders on the decisive questions of good faith and the final imposition of a compact on an unwilling or uncooperative state.

Absent the <u>Seminole Tribe</u> decision, this remedial plan is self-contained and fully sufficient. No one contends that the Secretary could have promulgated his alternative Procedures under IGRA before <u>Seminole Tribe</u> was decided. Nonetheless, the Appellees insist that IGRA implicitly conferred on the Secretary the power to substitute the Secretarial Procedures for the judicial remedy

18

foreclosed by Seminole Tribe.  This court must therefore move into the realm of the Chevron doctrine to determine whether the Secretarial Procedures faithfully interpret IGRA or, as the Appellees also assert, the general Indian trust statutes.  See Class III Gaming Procedures, 64 Fed. Reg. 17,535-02, 17,536 (Apr. 12, 1999) (Secretary asserts authority to prescribe the Procedures based on the statutory delegation of powers contained in 25 U.S.C. § 2710(d)(7)(B)(vii) of IGRA and 25 U.S.C. §§ 2 and 9).

## 2.  Chevron Step-One Analysis

The authority of administrative agencies is constrained by the language of the statute they administer.  See Massachusetts v. EPA, __U.S.__, 127 S. Ct. 1438, 1462 (2007).  Under the Chevron doctrine, courts assess the validity of challenged administrative regulations by determining whether (1) a statute is ambiguous or silent concerning the scope of secretarial authority and (2) the regulations reasonably flow from the statute when viewed in context of the overall legislative framework and the policies that animated Congress's design.  See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82 (1984).

### a.

Under Chevron step one, the inquiry is "whether Congress has directly spoken to the precise question at issue."  Id. at 842, 104 S. Ct. at 2781.  Judicial deference is due only "if the agency

19

interpretation is not in conflict with the plain language of the statute." Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 417, 112 S. Ct. 1394, 1401 (1992) (citing K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 292, 108 S. Ct. 1811, 1818 (1988)). Step one includes challenges to an agency's interpretation of a statute, as well as whether the statute confers agency jurisdiction over an issue. See generally FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S. Ct. 1291 (2000). "Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" Id. at 125, 120 S. Ct. at 1297 (quoting ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517, 108 S. Ct. 805, 817 (1988)).[6]

As was shown above in our discussion of the statute, the plain language of IGRA permits limited secretarial intervention only as a last resort, and only after the statute's judicial remedial procedures have been exhausted. See 25 U.S.C. § 2710(d)(7)(B)(i)-(vi). Congress did not explicitly authorize the Secretarial Procedures. Under Chevron step one, when, as here, "the statute is clear and unambiguous, that is the end of the matter; for [this] court, as well as the agency, must give effect

---

[6] Additionally, courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." Chevron, 467 U.S. at 133, 120 S. Ct. at 1301.

20

to the unambiguously expressed intent of Congress." K Mart, 486 U.S. at 291, 108 S. Ct. at 1817 (quoting Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 368, 106 S. Ct. 681, 685 (1986)); Chevron, 467 U.S. at 842-43, 104 S. Ct. at 2781-82.[7]

**b.**

Chevron deference "comes into play, of course, only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency." Sea-Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 645 (D.C. Cir. 1998) (citing Chevron, 467 U.S. at 842-44, 104 S. Ct. at 2781-83). Thus, even if there were an ambiguity concerning whether IGRA permits the Secretarial Procedures without exhaustion of its judicially-controlled remedy, an equally salient fact is that "[m]ere ambiguity in a statute is not evidence of congressional delegation of authority." Michigan v. EPA, 268 F.3d 1075, 1082 (D.C. Cir. 2001)(citing cases); Montana v. Clark, 749 F.2d 740, 745 (D.C. Cir. 1984) ("[D]eference to an agency's interpretation constitutes a judicial determination that Congress has delegated the norm-elaboration function to the agency and that the

---

[7] It is noteworthy that the "Indian canon" of statutory construction has no bearing on this case because IGRA unambiguously defines the scope of secretarial authority and the conditions under which such authority may be lawfully exercised. See Negonsott v. Samuels, 507 U.S. 99, 110, 113 S. Ct. 1119, 1125-26 (1993) (courts do not "resort to [the Indian] canon of statutory construction" when a statute is unambiguous (citation omitted)); Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n, 14 F.3d 633, 637 (D.C. Cir. 1994) ("When the statutory language is clear, as it is here, the [Indian] canon may not be employed.").

21

interpretation falls within the scope of that delegation." (emphasis in original) (citation omitted)). The Appellees' argument attempts to obviate <u>Chevron</u>'s delegation requirement by contending that, despite IGRA's meticulous description of the protracted remedial prelude to the Secretary's involvement in approving Class III gaming without a state's consent, this court can nonetheless discover a silent, or "implicit," delegation of secretarial authority. That is, Appellees contend that even though Congress specifically addressed the circumstances under which secretarial authority can be exercised — and even though those circumstances are absent here — the Secretary's actions are justifiable because IGRA does not explicitly address the Eleventh Amendment issue that arose in the wake of <u>Seminole Tribe</u>.

Courts encountering this kind of "whatever-it-takes" approach to <u>Chevron</u> analysis in the past have rejected it. <u>See, e.g.</u>, <u>Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC</u>, 962 F.2d 27, 33 (D.C. Cir. 1992) (appeals to a statute's broad purposes do not allow the discovery of implicit delegations of authority when Congress has explicitly delineated the boundaries of delegated authority). When Congress has directly addressed the extent of authority delegated to an administrative agency, neither the agency nor the courts are free to assume that Congress intended the Secretary to act in situations left unspoken. <u>See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers</u>, 414 U.S. 453, 458, 94 S. Ct. 690, 693 (1974) ("When a statute limits a thing to

22

be done in a particular mode, it includes the negative of any other mode." (quoting Botany Worsted Mills v. United States, 278 U.S. 282, 289, 49 S. Ct. 129, 132 (1929))).[8]  Accordingly, administrative agencies and the courts are "bound, not only by the ultimate purposes Congress has selected but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."  MCI Telecomm. Corp. v. AT&T Corp., 512 U.S. 218, 231 n.4, 114 S. Ct. 2223, 2232 n.4 (1994) (emphasis added).

Thus, at the heart of the Appellees' delegation argument is the assumption that since Congress did not explicitly withhold secretarial rulemaking authority in the event that a tribe is unable to obtain a judicial determination of the state's bad faith, the ensuing congressional "silence" creates an implicit delegation under Chevron to promulgate Class III gaming regulations.

That is an inaccurate interpretation of the nature of the delegation inquiry under Chevron's first step.  "Agency authority may not be lightly presumed."  Michigan, 268 F.3d at 1082.  "Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well."  Ethyl Corp. v. EPA, 51 F.3d

---

[8]  See also Pub. Serv. Comm. of State of N.Y. v. FERC, 866 F.2d 487, 491-92 (D.C. Cir. 1989) (executive agencies "cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined").

1053, 1060 (D.C. Cir. 1995); Michigan, 268 F.3d at 1082.[9]  It stands to reason that when Congress has made an explicit delegation of authority to an agency, Congress did not intend to delegate additional authority sub silentio.  See Backcountry Against Dumps v. EPA, 100 F.3d 147, 151 (D.C. Cir. 1996) (finding that explicit congressional delegation of authority precludes an implicit delegation more expansive than Congress's express terms).  Courts recognize an implicit delegation of rulemaking authority only when Congress has not spoken directly to the extent of such authority, or has "intentionally left [competing policy interests] to be resolved by the agency charged with administration of the statute." Chevron 467 U.S. at 865-66, 104 S. Ct. at 2793.

In IGRA, Congress plainly left little remedial authority for the Secretary to exercise.  The judicially-managed scheme of good-faith litigation, followed by negotiation, then mediation, allows the Secretary to step in only at the end of the process, and then only to adopt procedures based upon the mediator's proposed compact.  The Secretary may not decide the state's good faith; may not require or name a mediator; and may not pull out of thin air the compact provisions that he is empowered to enforce.  To infer

---

[9]     Nor can congressional silence on an issue be used as a panacea justifying rulemaking authority untethered from any trace of congressional intent.  "To suggest, as the [Secretary] effectively does, that Chevron step two is implicated any time a statute does not expressly negate the existence of a claimed administrative power . . . is both flatly unfaithful to the principles of administrative law and refuted by precedent." Am. Bar Ass'n v. FTC, 430 F.3d 457, 468 (D.C. Cir. 2005) (quoting Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd., 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (emphasis in original)).

24

from this limited authority that the Secretary was implicitly delegated the ability to promulgate a wholesale substitute for the judicial process amounts to logical alchemy.

### c.

Citing _Seminole Tribe_, Appellees further contend that a judicial decision can, _ex post facto_, create a _Chevron_-type "gap" that introduces ambiguity into the operation of a statutory scheme and thereby authorizes an administrative agency to step in and remedy the ambiguity. This claim ignores _Chevron_'s well-established requirement that any delegation-engendering gap contained in a statute, whether implicit or explicit, must have been "left open _by Congress_," not created after the fact by a court. _Chevron_, 467 U.S. at 866, 104 S. Ct. at 2793 (emphasis added).[10]

---

[10] Moreover, no other circuit court to have considered the propriety of the Secretarial Procedures in light of IGRA has discovered the statutory gap purportedly created by _Seminole Tribe_. The Eleventh Circuit has suggested without any analysis that if a state asserted Eleventh Amendment immunity against a tribe's lawsuit, the judicial good-faith determination was severable and unnecessary, and the Secretary could simply enforce against the state regulations governing Class III gaming. _See_ _Seminole Tribe of Fla. v. Florida_, 11 F.3d 1016, 1029 (11th Cir. 1994), _aff'd_, 517 U.S. 44, 116 S. Ct. 1114 (1996). A close reading of the Eleventh Circuit's decision, however, demonstrates that it meant to allow the Secretary to proceed under IGRA as if a judicial finding of lack of good faith had been made and a court-appointed mediator failed to bring the parties to terms. _See_ _id._ (citing § 2710(d)(7)(B)(vii) as the basis for the Secretarial Procedures). Nowhere does the Eleventh Circuit claim that a state's exercise of Eleventh Amendment sovereign immunity creates a statutory gap. Likewise, considering IGRA in the wake of the Supreme Court's _Seminole Tribe_ decision, the Ninth Circuit reaffirmed the centrality of the statutory balancing of interests in IGRA's remedial scheme, yet did not mention the apparent gap Appellees claim was created by the Supreme Court. _See_ _United States v. The Spokane Tribe of Indians_, 139 F.3d 1297, 1299-1300 (9th Cir. 1998).

Although later enacted statutory provisions may be relevant to determine congressional intent for purposes of Chevron ambiguity, see Brown & Williamson, 529 U.S. at 143-44, 120 S. Ct. at 1306-07, there is no support for the proposition that later court decisions affect or effect ambiguity. Chevron's delegation inquiry gauges congressional intent that is independent from subsequent administrative or judicial constructions of a statute. See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982, 125 S. Ct. 2688, 2700 (2005)("[W]hether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur."); see also Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S. Ct. 468, 471 (1988)("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Accordingly, even though court interpretation of IGRA produced the unexpected result that a state may "veto" Class III gaming by exercising its Eleventh Amendment sovereign immunity, that outcome has no bearing on the scope of the administrative authority originally delegated by Congress to the Secretary.

When it so desires, Congress has the power to confer expansive interpretive authority on agencies to accommodate changing or unpredictable circumstances. See, e.g., Massachusetts, __U.S. at__, 127 S. Ct. at 1462 ("The broad language of [Clean Air Act] § 202(a)(1) reflects an intentional effort to confer

26

flexibility necessary to forestall . . . obsolescence."). Like-wise, Congress knows well how to cabin agency authority through specific definitions that pretermit flexible interpretation. See, e.g., Ethyl Corp., 51 F.3d at 1058 (Congress unambiguously expressed that waiver decisions made under Clean Air Act § 211(f)(4) are based exclusively on one criterion). However, the fact that later-arising circumstances cause a statute not to function as Congress intended does not expand the congressionally-mandated, narrow scope of the agency's power. For example, in evaluating the validity of the Federal Reserve's interpretation of the Bank Holding Company Act in Dimension Financial, the Supreme Court observed that:

> Congress defined with specificity certain transactions that constitute banking subject to regulation. The statute may be imperfect, but the [Federal Reserve] Board has no power to correct flaws that it perceives in the statute it is empowered to administer. Its rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute. If the Bank Holding Company Act falls short of providing safeguards desirable or necessary to protect the public interest, that is a problem for Congress, not that Board or the courts, to address.

Dimension Fin. at 374-75, 106 S. Ct. at 689.[11]  In strikingly similar terms, the Seminole Tribe Court rejected Florida's invitation to prescribe a remedy unsupported by the language and legislative history of IGRA.  517 U.S. at 76, 116 S. Ct. at 1133 ("Nor are we free to rewrite [IGRA's] statutory scheme in order to approximate what we think Congress might have wanted had it known that § 2710(d)(7) was beyond its authority.  If that effort is to be made, it should be made by Congress, not by the federal courts.").[12]

---

[11]  Under the Chevron analysis, the question is whether Congress could be said to have delegated explicit or implicit authority to the agency to deal with an issue.  We focus here on implicit delegation since IGRA indisputably does not address the post-Seminole Tribe state of affairs.  The Dissent suggests that Congress effects an implicit delegation of legislative authority each time it decides an issue and withholds power from the agency in so doing.  Following this ungainly line of reasoning to its conclusion, the Dissent would hold that any time a court overturns a statute speaking expressly to an administrative issue, the agency has been delegated de facto implicit authority to revise the procedure as it sees fit.  That result stands Congress's exertion of power on it head, transforms a denial of agency authority into an implicit delegation thereto, and radically undercuts the Supreme Court's attempt in Chevron to distinguish between congressional power and agency authority in a principled way.  In the Indian gaming context, Congress reacted to the Cabazon Band decision by adopting a highly complex scheme to balance the tribal-state interests inherent in Indian gaming.  Congress could have simply authorized the Secretary to promulgate compacts however he chose to do so, or, it could have refrained from acting entirely.  It took neither route.  Instead, it explicitly withheld power from the Secretary to accomplish IGRA's balancing scheme.  As Dimension Financial states, no court decision can restore power that was withheld by Congress.

[12]  This comment was made in the context of the Supreme Court's rejection of a judicially crafted Ex Parte Young remedy — not the Secretarial Procedures at issue in this appeal. But Florida's proposed Ex Parte Young remedy was rejected by the Supreme Court because, like the Secretarial Procedures, it was contrary to the "carefully crafted and intricate remedial scheme set forth in § 2710(d)(7)" by Congress.  Seminole Tribe, 517 U.S. at 73-74, 116 S. Ct. at 1132.  The Supreme Court's reason for rejecting the Ex Parte Young remedy thus applies with equal force to the Secretarial Procedures here.  Nevertheless, we acknowledge that the Court explicitly refused to consider the Eleventh Circuit's "substitute remedy" of Secretarial Procedures.  Id. at 76, 116 S. Ct. at 1133; see also 517 U.S. 1133, 116 S. Ct. 1416 (1996) (mem.).

28

Nor does the fact that judicial interpretation of a statute leads to consequences unforeseen by Congress make a statute "ambiguous" within the meaning of <u>Chevron</u>. <u>See, e.g.</u>, <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 567, 125 S. Ct. 2611, 2625 (2005)(rejecting legislative history that might have demonstrated Congress "did not intend" to overrule a case because the statutory language was unambiguous that Congress did in fact overrule the case); <u>In re Abbott Labs.</u>, 51 F.3d 524, 528-29 (5th Cir. 1995) (applying the plain meaning of a statute even though that construction "may have been a clerical error"); <u>see also</u> <u>Thompson v. Goetzmann</u>, 337 F.3d 489 (5th Cir. 2003). In <u>Thompson</u>, the Department of Health & Human Services sought deference for its interpretation of a particular term, as construed in the applicable regulations and in its lawsuit for Medicare reimbursement. The court stated:

> [W]e reiterate that the courts are not in the business of amending legislation. If the plain language of the MSP statute produces the legislatively unintended result claimed by the government, the government's complaint should be addressed to Congress, not to the courts, for such revision as Congress may deem warranted, if any.

<u>Id.</u> at 493. Court decisions cannot serve to dilate or contract the scope of authority delegated by Congress to an administrative agency because delegation is a matter of legislative intent, not judicial interpretation. Thus, if Congress did not originally

intend to confer rulemaking authority, the Secretary cannot synthesize that authority from a judicial opinion.[13]

### 3. Reasonableness of Secretarial Procedures Under <u>Chevron</u>'s Step Two

Even were we to conclude under the <u>Chevron</u> step-one analysis that <u>Seminole Tribe</u> effected a <u>sub rosa</u> delegation of administrative authority allowing the Secretary to ignore Congress's explicit limitation of his authority in § 2710(d)(7)(B)(vii), the Secretarial Procedures still cannot pass muster under <u>Chevron</u> step two because they do not reasonably

---

[13] The United States' analogy to the Coal Act cases fails to lend support to its endorsement of the unauthorized actions Interior has taken in this case. The Fourth Circuit's decision in <u>The Pittston Co. v. United States</u>, 368 F.3d 385 (4th Cir. 2004), stands only for the proposition that an administrative agency's interpretation of a statute in light of a subsequent judicial decision may be permissible if that interpretation is (1) faithful to the authority Congress originally delegated to the agency and (2) does not contradict the plain language of the statute. That uncontroversial stance shares our view that the scope of authority delegated by Congress to an administrative agency is not altered by subsequent developments. <u>See, e.g.</u>, <u>Brand X</u>, 545 U.S. at 983, 125 S. Ct. at 2700. As the <u>Pittston</u> court recognized, the beneficiary reassignments undertaken by the Social Security Commissioner in the wake of <u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498, 118 S. Ct. 2131 (1998), did not "violate[] or disturb[] the structure of the Coal Act . . . . [The Commissioner] followed the Coal Act's assignment structure to the letter. . . . [T]he fact and method of applying the Coal Act . . . have not changed." 368 F.3d at 404-05; <u>see also</u> <u>A.T. Massey Coal Co. v. Holland</u>, 472 F.3d 148, 167 (4th Cir. 2006) ("[D]elegation must appear from the statute itself, not from the agency's actions"); <u>Sidney Coal Co. v. Soc. Sec. Admin.</u>, 427 F.3d 336, 347 n.15 (6th Cir. 2005). The same cannot be said of the Secretary's actions. In stark contrast to the Commissioner's reassignments in <u>Pittston</u>, here the Secretary did not promulgate Class III gaming regulations that correspond to the structure of IGRA. Instead, the Secretary has erected an ersatz remedial scheme that exceeds the authority Congress delegated to the Secretary under IGRA's remedial provisions. <u>Pittston</u> does not support the creation of a novel remedial scheme never envisioned by Congress and specifically contradictory of Congress's expressed intent concerning the scope of secretarial rulemaking. The application of a preexisting remedial scheme to a narrower pool of plan participants that was approved in <u>Pittston</u> is not remotely analogous to the wholesale invention of the remedial scheme that we are confronted with in the Secretarial Procedures. <u>Pittston</u> lends no support for the unprecedented "gapfilling" that the Secretary has undertaken in this case.

effectuate Congress's intent for IGRA. "If [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," a court will not disturb that choice "unless it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned." Chevron, 467 U.S. at 845, 104 S. Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 382-83, 81 S. Ct. 1554, 1560-61 (1961)); see also United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131, 106 S. Ct. 455, 462 (1985) (Chevron step two entails evaluation of agency action "in light of the language, policies and legislative history of the Act."). In any event, "[p]olicy considerations cannot override our interpretation of the text and structure of the Act." Cent. Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 188, 114 S. Ct. 1439, 1453-54 (1994). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron, 467 U.S. at 843 n.9, 104 S. Ct. at 2782 n.9. Thus, as with the delegation inquiry, Chevron step two compels a judicial evaluation of congressional intent. Because the Secretary's actions clearly violate IGRA's intent, they are unreasonable.

In IGRA, Congress struck a "finely-tuned balance between the interests of the states and the tribes" to remedy the Cabazon Band prohibition on state regulation of Indian gaming. United

31

States v. Spokane Tribe of Indians, 139 F.3d 1297, 1301 (9th Cir. 1998); S. REP. NO. 100-446, at 2 (1988), as reprinted in 1988 U.S.C.C.A.N. 3071, 3071-72 (noting Cabazon Band's holding that tribes "have a right to conduct gaming activities on Indian lands unhindered by State regulation"). Congress attempted to "provide a means by which tribal and State governments can realize their unique and individual governmental objectives" by giving tribes the opportunity to negotiate a Class III gaming compact, and by giving states the protection of an objective judicial intermediary in case negotiations prove unsuccessful. S. REP. NO. 100-446, at 13 (1988), as reprinted in 1988 U.S.C.C.A.N. 3071, 3083.

The lynchpin of IGRA's balancing of interests is the tribal-state compact. Melding the provisions for negotiation of a compact with the remedial structure ultimately included in IGRA took over five years to accomplish legislatively.[14] Moreover, IGRA's legislative history amply demonstrates that Congress viewed the compact as an indispensable prerequisite to Class III gaming. See id. at 6, as reprinted in 1988 U.S.C.C.A.N. 3071, 3076 ("[IGRA] does not contemplate and does not provide for the conduct of Class III gaming activities on Indian lands in the absence of a tribal-State compact"); id. ("tribes will be unable to enter into [Class III] gaming unless a compact is in place"). Congress

---

[14] The legislation to enable Indian gaming was first introduced as H.R. 4566, 97th Cong. (1983), by Representative Morris Udall in 1983. S. 555, 100th Cong. (1988), introduced by Senator Daniel Inouye, was enacted into law as IGRA in 1988.

32

considered — and rejected — other remedial structures that did not guarantee states such protections. The legislature eventually settled on IGRA's judicial remedy and the tribal-state compact requirement as the "best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises." Id. at 13, as reprinted in 1988 U.S.C.C.A.N. 3071, 3083.

Congressional intent on this score is pellucid. In order to conduct Class III gaming, tribes must either: (1) negotiate a voluntary compact with the state, see 25 U.S.C. § 2710(d)(3)(A)-(C); (2) obtain the state's agreement to the mediator-selected compact that follows the judicial good-faith process, see § 2710(d)(7)(B)(iii)-(vi); or (3) obtain secretarial Class III procedures based on the mediator-selected compact, see § 2710(d)(7)(B)(vii)(I). Absent a tribal-state compact, the statute forbids tribes to offer Class III gaming.

The tribal-state compact is in fact so central to the IGRA process that it is the only means by which the tribe can avoid incurring liability under other federal statutes that regulate Indian gaming. Two statutes, both of which antedate IGRA, are relevant to this issue. First, the Johnson Act, 15 U.S.C. § 1175 et seq., prohibits the possession or use of "any gambling device . . . within Indian country." Id. § 1175(a). Second, 18 U.S.C. § 1166 punishes gambling in Indian country in derogation of state law. Congress coordinated IGRA with these criminal provisions by

33

providing that the tribal-state compact is the exclusive means of avoiding gaming-related violations.[15] Apart from the limited circumstances in which IGRA allows Class III gaming to be imposed by the Secretary following exhaustion of the judicial good-faith/mediation process, Class III gaming remains illegal in Indian country without a tribal-state compact.

The role the Secretary plays and the power he wields under the Procedures bear no resemblance to the secretarial power expressly delegated by Congress under IGRA. First, IGRA interposes, before any secretarial involvement, the requirement that an impartial factfinder determine whether the state has negotiated in good faith. See § 2710(d)(7)(B)(iii). Under the Secretarial Procedures, however, it matters not that a state undertook good-faith negotiations with the tribe: The Secretary may prescribe Class III gaming irrespective of a state's good faith. See 25 C.F.R. § 291.7-.8. This result contravenes the plain language of IGRA.

Second, under IGRA, if mediation is ordered, it is undertaken by a neutral, judicially-appointed mediator who objectively weighs the proposals submitted by the state and tribe.

---

[15]    See IGRA § 2710(d)(6) (Johnson Act does not apply to gaming conducted under a tribal-state compact); see also United States v. Cook, 922 F.2d 1026, 1034 (2d Cir. 1991) (Johnson Act liability waived only by a Class III gaming compact between a state and tribe). Likewise, 18 U.S.C. § 1166(c)(2), referencing IGRA, excepts "class III gaming conducted under a Tribal-State compact." See, e.g., Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024, 1031 (2d Cir. 1990) (tribal-state compact required for waiver of 18 U.S.C. § 1166 liability).

34

See § 2710(d)(7)(B)(iv). Under the Procedures, however, the Secretary selects the mediator. 25 C.F.R. § 291.9. In light of the Secretary's statutory trust obligation to protect the interests of Indian tribes, this aspect of the Procedures is stacked against the objective interest-balancing Congress intended and creates the strong impression of a biased mediation process. See, e.g., Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt, 43 F.3d 1491, 1499 (D.C. Cir. 1995) (noting that "the Secretary was not in a position to champion the State's position in view of his trust obligations to the tribe." (citing Heckman v. United States, 224 U.S. 413, 444-45, 32 S. Ct. 424, 433-34 (1912))). Common sense dictates that the Secretary cannot play the role of tribal trustee and objective arbiter of both parties' interests simultaneously. Congress did not intend this incoherent result.

Third, whereas under IGRA's remedial scheme the court-appointed mediator essentially defines the regulations that the Secretary may promulgate, the Procedures enable the Secretary to disregard not only the mediator's proposal, but also the proposals of the state and tribe.[16] IGRA's remedial process makes clear that

---

[16] Compare § 2710(d)(7)(B)(vii) ("the mediator shall notify the Secretary and the Secretary shall prescribe . . . procedures (I) which are consistent with the proposed compact selected by the mediator under clause (iv)) with 25 C.F.R. § 291.11(c) ("If the Secretary rejects the mediator's proposal . . . he/she must prescribe appropriate procedures within 60 days under which Class III gaming may take place that comport with the mediator's selected proposal as much as possible, the provisions of IGRA, and the relevant provisions of the laws of the State.").

35

Congress did not intend to delegate to the Secretary unbridled power to prescribe Class III regulations.

Fourth, the Secretarial Procedures contemplate Class III gaming in the absence of a tribal-state compact — directly in derogation of Congress's repeated and emphatic insistence. See, e.g., S. REP. NO. 100-446, at 6 (1988), as reprinted in 1988 U.S.C.C.A.N. 3071, 3076 ("[IGRA] does not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absence of a tribal-State compact.").[17] The only exception to the compact requirement Congress envisioned was the promulgation of procedures after a bad-faith determination and in concert with the proposal selected by a court-appointed mediator. Yet in spite of this single statutory exception — the product of IGRA's complex and balanced remedial scheme — Appellees maintain it is equally reasonable to assume that Congress intended a waiver of liability under the Johnson Act and 18 U.S.C. § 1166 even without a judicial determination of bad faith; without the participation of a court-appointed mediator; and without the requirement that the regulations ultimately promulgated be "consistent with the proposed

---

[17] Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 105-83, 111 Stat. 1543, 1570 (1998) ("SENSE OF THE SENATE CONCERNING INDIAN GAMING. It is the sense of the Senate that the United States Department of Justice should vigorously enforce the provisions of the Indian Gaming Regulatory Act requiring an approved Tribal-State gaming compact prior to the initiation of class III gaming on Indian lands.")

compact selected by the [court-appointed] mediator." § 2710(d)(7)(b)(vii)(I).[18]

For all these reasons, the Secretary's Class III Procedures are not a reasonable interpretation of IGRA, especially when viewed against "their place in the overall statutory scheme." Brown & Williamson, 529 U.S. at 133, 120 S. Ct. at 1301. The Secretary, of course, is not authorized to promulgate regulations in violation of federal law, see Sohappy v. Hodel, 911 F.2d 1312, 1320 (9th Cir. 1990), yet the Secretarial Procedures stand in direct violation of IGRA, the Johnson Act, and 18 U.S.C. § 1166 insofar as they may authorize Class III gaming without a compact. Because "the Executive Branch is not permitted to administer the Act in a manner that is inconsistent with the administrative structure that Congress enacted into law," and because doing so constitutes an unreasonable interpretation of Congress's intent,

_____

[18] Commentators have noted the problems with the Procedures. See Rebecca S. Lindner-Cornelius, Note, The Secretary of the Interior as Referee: The States, The Indian Nations, and How Gambling Led to the Illegality of the Secretary of the Interior's Regulations in 25 C.F.R. § 291, 84 MARQUETTE L. REV. 685, 695 (2001) (arguing that the regulations are unconstitutional and noting that "when a state claims it has negotiated in good faith to no avail, the only recourse it is left with is a biased factfinder who can do what it wants without any state input"); Nicholas S. Goldin, Note, Casting a New Light on Tribal Casino Gaming: Why Congress Should Curtail the Scope of High Stakes Indian Gaming, 84 CORNELL L. REV. 798, 843-44 (1999) (arguing that the Procedures are "troubling" because the Secretary "assumes a massive unilateral power that Congress did not intend to delegate" and because the Procedures "make a travesty of the concept of federalism and in its place substitute a system in which Washington claims it knows best what state laws mean"); Joe Laxague, Note, Indian Gaming and Tribal-State Negotiations: Who Should Decide the Issue of Bad Faith?, 25 J. LEGIS. 77, 91 (1999) (arguing that the Procedures "do both parties a disservice and badly skew the balance of interests intended by Congress when it wrote the IGRA").

the Secretarial Procedures cannot pass muster under <u>Chevron</u> step two.  <u>ETSI Pipeline Project</u>, 484 U.S. at 157, 108 S. Ct. at 817.

### 4.  General Authority Statutes

An alternative contention raised by Appellees is that secretarial authority to promulgate the Procedures derives from the general Indian trust statutes when read in concert with § 2710(d)(7)(B)(vii).  <u>See</u> 25 U.S.C. §§ 2, 9; 64 Fed. Reg. 17,535-02, 17,536 (Apr. 12, 1999).  To be sure, courts may consider "generally conferred authority" in the statutory scheme to determine the propriety of administrative agency action.  <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229, 121 S. Ct. 2164, 2172 (2001).  But sections 2 and 9 do not grant Interior "a general power to make rules governing Indian conduct."  <u>Organized Vill. of Kake v. Egan</u>, 369 U.S. 60, 63, 82 S. Ct. 562, 564 (1962).  Instead, the authority Congress there delegated to the Secretary only allows prescription of regulations that implement "specific laws," <u>id.</u>, and that are consistent with other relevant federal legislation.  <u>See</u> <u>Morton v. Ruiz</u>, 415 U.S. 199, 232, 94 S. Ct. 1055, 1073 (1974); <u>N. Arapahoe Tribe v. Hodel</u>, 808 F.2d 741, 748 (10th Cir. 1987) (citing <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 91 S. Ct. 814 (1971)).  Thus, in <u>Village of Kake</u>, the Secretary issued fishing regulations ostensibly permitted under the White Act and the Alaska Statehood Act.  However, the regulations, which allowed the Kake community to operate four fish traps,

38

violated Alaska's anti-fish-trap and conservation law. Because Interior could point to no affirmative statutory grant of authority that allowed the Secretary to issue regulations in derogation of state law, the Supreme Court held that the Secretary had exceeded the authority granted by sections 2 and 9. Id. at 62, 82 S. Ct. at 564. Village of Kake demonstrates that the Secretary lacks carte blanche to issue regulations pursuant to a generalized grant of authority untethered from the confines of preexisting statutorily defined rights. See United States v. Eberhardt, 789 F.2d 1354, 1360 (9th Cir. 1986).

For example, in Eberhardt, the Ninth Circuit approved secretarial regulations imposing a moratorium on commercial fishing on the Hoopa Valley Reservation. The court held that the Secretary was authorized to issue the regulations pursuant to the preexisting fishing rights that were granted when Congress authorized creation of the Hoopa Valley Reservation by statute. See People v. McCovey, 685 P.2d 687, 697 (Cal. 1984) (citing Menominee Tribe v. United States, 391 U.S. 404, 405-06, 88 S. Ct. 1705, 1707 (1968)). In similar fashion, the caselaw overwhelmingly confirms that sections 2 and 9 do not empower issuance of regulations without a statutory antecedent. See, e.g., Washington v. Wash. State Commercial Passenger Fishing Vessel Assoc., 443 U.S. 658, 691, 99 S. Ct. 3055, 3077 (1979) (sections 2 and 9 effectuate rights granted by treaty); N. Arapahoe Tribe, 808 F.2d at 749 (general trust statutes "together with the Treaty . . . provide the neces-

39

sary authority for the Secretary to enact these regulations."); United States v. Michigan, 623 F.2d 448, 450 (6th Cir. 1980) (upholding secretarial regulations governing rights conferred by treaty).[19]

IGRA, however, does not guarantee an Indian tribe the right to conduct Class III gaming and therefore cannot serve as a statutory antecedent justifying the Secretarial Procedures. IGRA grants tribes the right to negotiate the terms of a tribal-state compact, see 25 U.S.C. § 2710(d)(3)(A), and by agreement to "regulate class III gaming on its Indian lands concurrently with the State." § 2710(d)(5). Tribes, likewise, have the right to bring suit against a state for its failure "to enter into negotiations with the Indian tribe." See § 2710(d)(7)(A)(i). Seminole Tribe, of course, clarified that the tribe's right is subject to the state's exercise of an affirmative jurisdictional

---

[19]    In addition to the requirement that the regulations be issued in accordance with the rights conferred on the tribe by existing federal legislation, here, IGRA courts have recognized that sections 2 and 9 address the protection and management of "Indian trust resources" – typically natural resources or property. See, e.g., Washington v. Wash. State Commercial Passenger Fishing Vessel Assoc., 443 U.S. 658, 99 S. Ct. 3055 (1979) (fishing rights); Chippewa Indians of Minn. v. United States, 301 U.S. 358, 57 S. Ct. 826 (1937) (land allotment); Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy, 898 F.2d 1410 (9th Cir. 1990) (fisheries preservation); N. Arapahoe Tribe v. Hodel, 808 F.2d 741 (10th Cir. 1987) (hunting and fishing rights); see also Morton v. Ruiz, 415 U.S. 199, 94 S. Ct. 1055 (1974) (payment of general assistance benefits authorized under 25 U.S.C. § 13); Seminole Nation v. United States, 316 U.S. 286, 62 S. Ct. 1049 (1942) (money held in trust by the United States). Appellees' assertion that sections 2 and 9 apply here assumes that anticipated gambling revenues constitute an Indian trust resource within the meaning of those statutes. This assertion is especially unjustified since, under IGRA, after a tribal-state compact is in place the Secretary has no role whatsoever in the management or oversight of Class III gaming. See 25 U.S.C. § 2710(d)(5).

defense under the Eleventh Amendment. In any case, the Secretary's acting under sections 2 and 9 cannot sidestep IGRA's remedial process for two reasons. First, there would have been no reason for IGRA to prescribe any procedures had Congress been willing to or believed it could entrust them entirely to the Secretary's general powers. Second, the fact that IGRA clearly limited the Secretary's intervention into Class III gaming compacts constitutes the best evidence of congressional intent to limit the Secretary's role.

## IV. CONCLUSION

The Secretarial Procedures violate the unambiguous language of IGRA and congressional intent by bypassing the neutral judicial process that centrally protects the state's role in authorizing tribal Class III gaming. Congress, to be sure, could omit states entirely from Class III gaming regulation. See Cabazon Band, 480 U.S. at 207, 107 S. Ct. at 1087. But we need not speculate on legislative alternatives that Congress might adopt in response to Seminole Tribe. Suffice it here to say that the balance Congress did strike cannot be wholly revised by substitute procedures that contradict Congress's explicit statutory instructions. The Secretarial Procedures are invalid and constitute an unreasonable interpretation of IGRA. When, as here, "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed

41

intent of Congress." <u>Chevron</u>, 467 U.S. at 842–43, 104 S. Ct. at 2781.

Pursuant to the foregoing discussion, we REVERSE the district court's judgment and REMAND for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

KING, Circuit Judge, concurring in part and in the judgment:

I concur in Part III.A of the opinion, which deals with justiciability. On the merits, I concur only in the judgment, reversing the district court's conclusion that the Secretary of the Interior ("Secretary") had the authority to promulgate the challenged regulations.

In my view, the lack of any provision in the Indian Gaming Regulatory Act ("IGRA") addressing the dismissal of an Indian tribe's enforcement suit on sovereign immunity grounds is a statutory gap that is akin to the gap recognized in Pittston Co. v. United States, 368 F.3d 385, 403-04 (4th Cir. 2004), and Sidney Coal Co. v. Social Security Administration, 427 F.3d 336, 346 (6th Cir. 2005). Those cases held that the Social Security Commissioner had implicit authority to fill a gap exposed by the Supreme Court's invalidation of a portion of the Coal Industry Retiree Health Benefit Act of 1992; in this case the Secretary's general authority to effectuate statutes relating to Indian affairs provides analogous gap-filling power with regard to IGRA. See 25 U.S.C. §§ 2, 9; Morton v. Ruiz, 415 U.S. 199, 231 (1974); Organized Village of Kake v. Egan, 369 U.S. 60, 63 (1962).

However, the Secretary's authority to effectuate IGRA's provisions does not include the power to jettison some of those provisions in the cause of gap-filling, regardless of whether they no longer seem wise or appropriate in light of events that Congress did not foresee. In my opinion, the method used by the Secretary to fill the gap here—creating an alternative remedial scheme that allows the Secretary to issue Class III gaming procedures without Congress's chosen prerequisites of a court determination of a state's bad faith and court-directed mediation, see 25 U.S.C. § 2710(d)(7)—goes beyond the mere effectuation of IGRA's provisions into the realm of wholesale statutory amendment. Cf. Gonzales v. Oregon, 546 U.S. 243, 258 (2006) ("Chevron

43

deference . . . is not accorded merely because the statute is ambiguous . . . . To begin with, the rule must be promulgated pursuant to authority Congress has delegated to the official."). By omitting those prerequisites, though for understandable reasons, the Secretary's method fails to preserve the core safeguards by which state interests are protected in Congress's "carefully crafted and intricate remedial scheme." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 73-74 (1996); cf. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 91 (2002) (invalidating an administrator's remedial regulation that "worked an end run around important limitations of the [relevant] statute's remedial scheme" by allowing a penalty to be imposed without the threshold court determination provided for by the statute). And despite a state's unforeseen and unintended ability to prevent the necessary court involvement from occurring, the Secretary "has no power to correct flaws that [he] perceives in the statute [he] is empowered to administer. [His] rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute." Bd. of Governors v. Dimension Fin. Corp., 474 U.S. 361, 374 (1986).

Today's decision returns IGRA's Class III gaming system to the complicated situation that existed after the Supreme Court's decision in Seminole Tribe, with a state having the leverage to block gaming on Indian land under IGRA in a manner wholly contrary to Congress's intent. Alternatively, one could argue that a tribe dealing with a state that will not negotiate or consent to an enforcement suit is no longer bound by IGRA's prohibition on gaming without a compact, depending on the circumstances. See, e.g., United States v. Spokane Tribe of Indians, 139 F.3d 1297 (9th Cir. 1998). We do not resolve these difficulties here, as they are not before this court. But because neither result is consistent with IGRA's design, the situation clearly calls for congressional action.

DENNIS, Circuit Judge, dissenting.

I.

The State of Texas permits certain types of gaming equivalent to Class III gaming as defined by the IGRA. But Texas adamantly refuses to negotiate with the Kickapoo Traditional Tribe towards a Class III gaming compact under the IGRA and has blocked the tribe from seeking a remedy in federal court by invoking its right to Eleventh Amendment sovereign immunity from suit. Therefore, the Tribe pursued its only alternate remedy of asking the Secretary of the Interior to issue Class III gaming procedures under the Secretarial Gaming Procedures, 25 C.F.R. §§ 291.1-291.15. The Secretary requested comment from the State of Texas pursuant to 25 C.F.R. § 291.7, but the state declined to comment. The Secretary has not yet taken final action on the Tribe's proposal.

The State of Texas brought this action against the Secretary, the Department of the Interior and the United States challenging the authority of the Secretary to promulgate the Secretarial Gaming Procedures regulations and seeking to permanently enjoin the application of 25 C.F.R. § 291.1, et seq., in respect to the state of Texas. The Kickapoo Traditional Tribe intervened. The district court ruled that Texas's claims were not ripe, but expressed its opinion that the regulations were validly promulgated and should be upheld. Texas v.

<u>United States</u>, 362 F. Supp.2d 765 (W.D. Tex. 2004). Texas appealed. The defendants-appellees and the intervener contend that Texas's suit should be dismissed because it lacks standing, its claim is not ripe, and the Secretarial Gaming Procedures regulations are valid. I pretermit the serious standing and ripeness issues but dissent from the merits of Chief Judge Jones' opinion, portions of Judge King's opinion, and the judgment for the following reasons.

II.

The principles governing our review of the Secretary's interpretation and implementation of the pertinent statutes are well established. Administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001); <u>see also</u> <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984). Congressional delegation to an administrative agency of authority generally to make rules carrying the force of law may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rule-making, or by some other indication of a comparable congressional intent. <u>Mead</u>, 533 U.S. at 227.

46

When Congress has explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. Id. Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. Id. "The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Morton v. Ruiz, 415 U.S. 199, 231-32 (1974).

When circumstances imply that Congress would expect an agency to be able to speak with the force of law, even though Congress may not have expressly delegated authority or responsibility to implement a particular provision, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, and instead is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable. Id. at 229.

III.

47

The regulations challenged here, pertaining to the Secretarial Gaming Procedures, deserve <u>Chevron</u> deference because Congress explicitly authorized the Secretary to promulgate regulations to carry into effect any statute relating to Indian affairs or arising out of Indian relations, <u>see</u> 25 U.S.C. §§ 1a, 2 & 9; and implicitly authorized the Secretary to promulgate the regulations at issue here to fill the gap in the IGRA created by Congress's unintentional failure to provide for the unforeseen ineffectiveness of a federal court suit as the tribal remedy in cases in which a state refused to bargain in good faith and invoked its Eleventh Amendment sovereign immunity; the regulations are reasonably designed and appropriate for carrying into effect the IGRA after the ineffectiveness of its remedial provision was revealed by <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44 (1996); and the regulations are binding in the courts because they are not procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statutes.

Beginning in 1832 and 1834, Congress explicitly authorized the President through the Secretary of the Interior to "prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs," 25 U.S.C. § 9; and to authorize the Commissioner of Indian affairs to, "under the direction of the Secretary of the Interior, and agreeably to such regulations as the

48

President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations." 25 U.S.C. § 2.[1] Acting pursuant to these broad powers, the Secretary has, following formal notice-and-comment rule-making procedures, promulgated procedures governing numerous programs and activities related to Indian affairs and relations.

Prior to the enactment of the IGRA, states generally were precluded from any regulation of gaming on Indian reservations. California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987). The IGRA, by offering states an opportunity to participate with Indian tribes in establishing gaming through a tribal-state compact, "extend[ed] to the States a power withheld from them by the Constitution." Seminole, 517 U.S. at 58. Consequently, it is clear that before the enactment of the IGRA, the Secretary could have adopted, under 25 U.S.C. §§ 1a, 2, & 9, regulations approving and governing gambling on Indian reservations to the extent it was not prohibited by general state laws.

Congress's enactment of the IGRA in 1988 did not in any way diminish the broad powers of the President or the Secretary to "prescribe such regulations as he may think fit for carrying into effect ... any act relating to Indian affairs ... or [management of] matters arising out of Indian relations." See 25 U.S.C. §§ 2 & 9. When the Supreme Court subsequently held in Seminole that Congress is not

---

[1]    See Morton v. Ruiz, 415 U.S. 199 (1974); see also 25 U.S.C. § 1a.

authorized by the Indian commerce clause to abrogate a state's Eleventh Amendment sovereign immunity, this unforeseen event disclosed the ineffectiveness of the remedy Congress had granted tribes in the IGRA to sue recalcitrant states in federal court. The immediate result was that states could, as Texas has done, refuse to bargain and invoke sovereign immunity against a tribe's federal court remedy. This revealed that after <u>Seminole</u> the tribes had no remedy to enforce the IGRA, a gap in the statute that Congress had not anticipated and had unintentionally failed to provide for. Under these circumstances, it became the Secretary's clear duty to use his broad rule-making powers under 25 U.S.C. §§ 1a, 2 and 9 to provide alternate remedies and procedures necessary to carry the IGRA into effect. Nothing in the IGRA or its legislative history indicates an intention to prevent the Secretary from retaining and putting his broad rulemaking powers to this use.

The purpose of the IGRA is not simply to establish a neutral bargaining forum; IGRA's purpose is to affirmatively help Indian tribes enter and conduct the business of gaming, where gaming is not prohibited by state laws of general application, as a means of "promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). The IGRA federal court action remedy was "designed to ensure the formation of a Tribal-State compact." <u>Seminole</u>, 517 U.S. at 49-50. Because this remedy has

been shown to be inoperative by <u>Seminole</u>, the Secretary's Gaming Procedures are consistent with the purpose and provisions of the IGRA and are the most reasonable regulations that could be administratively prescribed to carry the IGRA into effect.

IV.

With respect, there is no valid basis for Chief Judge Jones's assertion that a judicial interpretation of a statute cannot lead to an ambiguity, gap or unprovided for case susceptible to the <u>Chevron</u> step-two analysis.  To the contrary, there is no other way for a court to identify a statutory ambiguity or gap than through the process of judicial interpretation.

The argument that a court decision "creates" a gap is based on a theory inconsistent with the common-law tradition of the federal courts. The prevailing view is that the judicial power vested in the federal courts allows them to declare what the law already is, rather than to create new law as the Chief Judge's argument presupposes that the Court did in <u>Seminole</u>. <u>See</u> <u>American Trucking Associations, Inc. v. Smith,</u> 496 U.S. 167, 201  (1990) (Scalia, J., concurring in judgment); <u>Linkletter v. Walker</u>, 381 U.S. 618, 622-23 (1965). Under the prevailing Supreme Court view, the ambiguity or gap in the IGRA was created by the Congress when it unintentionally chose and enacted a constitutionally ineffectual tribal remedy, and not by the Court in the <u>Seminole</u> decision. The

Supreme Court's principles governing retroactive application of its decisions reflect this view: "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 97 (1993).[2] Under prevailing Supreme Court theory, the Seminole decision is and always was the law. The Supreme Court does not create law, it discovers it - and the Supreme Court did not create the gap in this case, but merely declared its existence. Congress itself created the gap or ambiguity by mistakenly overestimating its powers and passing a statute that could not be constitutionally applied as Congress intended.

The claim that a Chevron gap does not exist when a judicial decision has demonstrated an ambiguity in the statute has been emphatically rejected by other courts. In A.T. Massey Coal Co. v. Holland, 472 F.3d 148, 168 (4th Cir. 2006), the Fourth Circuit discussed a case in which a gap was "created when the Supreme Court found a portion of [a] provision unconstitutional." It held that

----

[2] For a full discussion of the history of the common law retroactivity principle and the Supreme Court's recent return to the traditional view that it discovers law, rather than makes it, see Hulin v. Fibreboard Corp., 178 F.3d 316, 329-33 (5th Cir. 1999).

"[o]nce that gap was created, the agency was left with an open policy space, which was the quintessence of legislative-type action to which Chevron deference was due." Id. In another case, Pittston Co. v. United States, 368 F.3d 385, 403-04 (4th Cir. 2004), the Fourth Circuit considered a gap disclosed by a judicial decision holding a portion of the Coal Act to be unconstitutional:

> In drafting the Coal Act, Congress did not contemplate that some members of the "signatory operators" group could not constitutionally be required to contribute to the Combined Fund. The situation faced by the Commissioner was thus the kind of "case unprovided for" that allows her to engage in gap-filling. See Barnhart v. Peabody Coal Co., 537 U.S. 149, 169 (2003).

Id. The Sixth Circuit agreed that a gap for Chevron purposes was created when a portion of the Coal Act proved to be unintentionally ineffective. Sidney Coal Co. v. Soc. Sec. Admin., 427 F.3d 336, 346 (6th Cir. 2005) (holding that a gap existed because "the Coal Act contains no language as to how the SSA should have handled the precise question raised by the Eastern Enterprises holding").

Chief Judge Jones's attempt to distinguish these cases is unpersuasive and circular. She contends that because Congress must be able to foresee each gap and each agency rule chosen to fill it, the Secretary's remedial scheme here to fill the gap exceeds the scope of the authority delegated by Congress; so that, the gap created by judicial decision recognized in Pittson and A.T. Massey could not

53

have existed in the first place. This is a tortured logic that conflates two fundamentally distinct questions: was there a gap or ambiguity, and if so, did the Secretary exceed its authority in attempting to fill it?

Contrary to the suggestion of Chief Judge Jones, the language of Chevron does not require that Congress must be able to envision a future gap or ambiguity and the particular provision that the agency may choose to fill it or clarify it before it can come within the scope of the agency's implicitly authorized rulemaking. "[I]t can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which Congress did not actually have an intent as to a particular result." Mead, 533 at 229 (quotations omitted) (emphasis added). Congress may "create" a gap by explicitly delegating a question of interpretation to an agency; Chevron, 467 U.S. at 843-44; by implicitly doing so; id. at 844; or by simply remaining silent "with respect to the specific issue;" id. at 843. It is inherent in the policymaking process that some unforeseen event, or "case unprovided for," could render a portion of a statute ambiguous or meaningless. See Barnhart v. Peabody Coal Co., 537 U.S. 149, 169 (2003). The Ninth Circuit best described the situation that confronted the Secretary and now confronts us:

We are left, then, with a tribe that believes it has followed IGRA faithfully and has no legal recourse against a state that allegedly hasn't bargained in good faith. Congress did not intentionally create this situation and would not have countenanced it had it known then what we know now.

United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1302 (9th Cir. 1998). There is no support for the suggestion that Congress cannot, through its unintentional silence, create a gap or an ambiguity concerning how to enforce the IGRA after a portion of it, the sole tribal remedy originally chosen, has been invalidated.

V.

Chief Judge Jones further errs in contending that there has been no explicit or implicit congressional delegation of authority to the Secretary of the Interior to promulgate gap-filling regulations under the IGRA. Contrary to her assertions, the Secretary does not hang his hat on a mere failure of Congress to expressly withhold a delegation of agency authority. Rather, the Secretary of the Interior is the agency Congress would have expected to fill any such gap, given the powers granted to it under the IGRA and its general authority statutes. Chief Judge Jones focuses narrowly on the particular IGRA provision at issue here, relying conclusively on the fact that the IGRA itself does not contain an express delegation of agency authority to provide an alternate tribal remedy.

The Supreme Court, by contrast, has instructed us to broaden our inquiry outside of the particular provision we are reviewing to include all statutes and circumstances pertaining to the agency's powers:

> Congress, that is, may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not actually have an intent" as to a particular result. When circumstances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable....

Mead, 533 U.S. at 229 (internal citations omitted). Instead of inquiring into whether Congress would have expected the Secretary of the Interior to address any ambiguities in the IGRA, Chief Judge Jones focuses on whether the particular IGRA statutory provision at issue included a delegation of authority to the Secretary - an analysis that is both contrary to the Supreme Court's admonition in Mead and that would impose an impractical burden on Congress

of including express delegations of an agency's authority to administer every provision of every statute under its aegis.

Chief Judge Jones's analysis of the general authority statutes and the IGRA itself is similarly unpersuasive. Her opinion rejects the significance of 25 U.S.C. §§ 2 & 9, the general authority statutes for the Department of the Interior, based on a misplaced reliance on the Supreme Court's decision in Organized Village of Kake v. Egan. 369 U.S. 60 (1962). Kake is a weak authority for her position for several reasons. Even if it made the sweeping holdings Chief Judge Jones attributes to it, the case was decided in 1963 and did not conduct the modern analysis required by more recent cases such as Chevron and Mead. A greater difficulty for Chief Judge Jones is that while it does indeed include language to the effect that these sections do not grant the Interior "a general power to make rules governing Indian conduct," that language was not the holding of the court in that case. That language was, instead, a quotation from an Interior Department Handbook, and was not expressly adopted by the Court. The Court's actual legal holding with respect to the scope of the general authority statutes was confined to a single sentence: "We agree that they do not support the fish-trap regulations." Kake, 369 U.S. at 63. Most significantly, in Kake the Court was analyzing a situation in which other Congressional legislation, the White Act, had expressly narrowed the authority of the Secretary

of the Interior under 25 U.S.C. §§ 2 and 9 in the specific area in which he attempted to act. Id. at 62-63. It was also plain that, unlike in this case, there was no underlying statute being enforced and the Secretary was not attempting to "implement specific laws" - a power the Handbook referenced by the Supreme Court in Kake concluded was granted to Interior under the general authority statutes. Id.

Chief Judge Jones's reliance on United States v. Eberhardt, 789 F.2d 1354 (9th Cir. 1986), similarly distorts the actual holding of the case. Her opinion omits that court's holding that "the general trust statutes in Title 25 do furnish Interior with broad authority to supervise and manage Indian affairs and property commensurate with the trust obligations of the United States." Id. at 1360. In distinguishing Kake and concluding that the general authority statutes were broad in scope, the Eberhardt court added that "Congress must be assumed to have given Interior reasonable power to discharge its broad responsibilities for the management of Indian affairs effectively." Id. at 1361.

Chief Judge Jones's opinion further avoids referencing other cases that have also come to the conclusion that the Secretary of the Interior has comprehensive powers under the general authority statutes to effectuate other Indian-related legislation. The D.C. Circuit, from which her opinion eagerly borrows in other sections, emphatically disagrees with a cramped view of the

58

general authority statutes such as hers. That court described the powers of the Secretary of the Interior under the general authority statutes as follows:

> In charging the Secretary with broad responsibility for the welfare of Indian tribes, Congress must be assumed to have given him reasonable powers to discharge it effectively. Courts have taken this approach with respect to various aspects of Indian life, recognizing that '[this] statute furnishes broad authority for the supervision and management of Indian affairs and property commensurate with the obligation of the United States.'

> In our opinion the very general language of the statutes makes it quite plain that the authority conferred upon the Commissioner of Indian Affairs was intended to be sufficiently comprehensive to enable him, agreeably to the laws of Congress and to the supervision of the President and the Secretary of the Interior, to manage all Indian affairs, and all matters arising out of Indian relations, with a just regard, not merely to the rights and welfare of the public, but also to the rights and welfare of the Indians, and to the duty of care and protection owing to them by reason of their state of dependency and tutelage.

Udall v. Littell, 366 F.2d 668, 672-73 (D.C. Cir. 1966) (internal citations and footnotes omitted). Other circuits have agreed that the Secretary's powers to promulgate regulations to effectuate all Indian-related statues are broad in scope. See Armstrong v. United States, 306 F.2d 520, 522 (10th Cir. 1962) ("This

statute furnishes broad authority for the supervision and management of Indian affairs and property commensurate with the obligation of the United States.").

Inexplicably, the Chief Judge's opinion fails to acknowledge that, subsequent to Kake, the Supreme Court in Morton v. Ruiz, in articulating the keystone to the Chevron doctrine, simultaneously recognized that Congress intended for the Secretary of the Interior to play a major policy-making, rule-making, and gap-filling role in effectuating its Indian-related statutes. The Court plainly rejected an impracticably constrained view of the Secretary's powers in stating:

> The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. In the area of Indian affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates at the BIA.

415 U.S. at 231-32 (footnotes citing and quoting 25 U.S.C. §§ 2 & 9 as authority omitted).

Pursuant to its general authority under 25 U.S.C. §§ 2 & 9, recognized so clearly by Morton v. Ruiz and later built upon in Chevron, the Secretary of the Interior has successfully promulgated regulations governing activities across the

60

spectrum of Indian affairs. <u>See</u> 25 C.F.R. § 23.1 (regulating child and family service programs under the Indian Child Welfare Act); 25 C.F.R. § 89.30 (approval of legal contracts with certain tribes); 25 C.F.R. § 166.1 (imposing grazing restrictions on tribal lands); 25 C.F.R. § 241.1 (regulating fishing on certain reservations); 25 C.F.R. § 150.1 (regulating the recording, certification, and use of title documents on tribal lands); 25 C.F.R. § 61.1 (regulating the management of rolls and membership lists of Indian tribes); 25 C.F.R. § 83.1 (establishing procedures for determining whether a group constitutes an Indian tribe).

Chief Judge Jones is further incorrect in suggesting that there is no "statutory antecedent" to support the Secretary's regulations at issue here under the general authority statutes. The short answer to Chief Judge Jones's suggested complaint, of course, is that there is an obvious "statutory antecedent" here - the IGRA itself, which clearly evinces Congress's intent to empower the Secretary to authorize Indians to conduct gaming businesses on tribal reservations where not prohibited by general state laws and after giving states a full and fair opportunity to bargain in good faith over the specific terms of the individual tribal gaming regulations. It turns out, however, that her argument in this respect is simply another version of her argument against implicit agency authority, diametrically contrary to <u>Chevron</u> and <u>Mead</u>, to the effect that each

61

separate Indian-related statute must explicitly authorize the Secretary to carry it into effect, i.e., that the general authority statutes alone do not really do what they purport to — empower the Secretary to prescribe regulations to effectuate subsequent Indian-related statutes. The cases upon which the Chief Judge relies, again, however, do not see her argument through. In the final analysis, they stand only for the simple proposition that in order for the Secretary to use his general authority under 25 U.S.C. §§ 2 and 9 to prescribe regulations to carry a subsequent statute into effect, there must first be a statute or a treaty to effectuate. See N. Arapahoe Tribe v. Hodel, 808 F.2d 741, 745-46 (10th Cir. 1987) (holding that 25 U.S.C. § 9 could not be applied unless it was to carry "into effect the various provisions of any act relating to Indian affairs," but that a treaty could in effect substitute for an act or statute); United States v. Michigan, 623 F.2d 448, 450 (6th Cir. 1980) (holding only that the requirement is not a difficult one to meet and that a treaty can substitute for an "act relating to Indian affairs"). The Chief Judge's opinion plays a linguistic game, using the phrase "statutory antecedent" to suggest that there must be some specific provision in every Indian-related statute granting the authority to invoke sections 2 and 9 - when, in fact, the courts have only logically required that some sort of statute or law related to Indian affairs be extant before the Secretary can prescribe regulations to carry it into effect. In other words, when Congress enacts a statute

pertaining to Indian affairs and relations, but not before, it becomes the duty of the President and the Secretary to exercise their powers under 25 U.S.C. § 2 & 9 to promulgate rules necessary to give it effect. Ruiz, 415 U.S. at 231.

Chief Judge Jones's further assertion that "the fact that IGRA clearly limited the Secretary's intervention into Class III gaming compacts constitutes the best evidence of congressional intent to limit the Secretary's role" ignores the reality of the situation here: that Congress enacted the statute without foreknowledge of the Supreme Court's decision in Seminole. That Congress did not contemplate a need for the Secretary to prescribe an alternate tribal remedy to fill a gap is merely a function of Congress's failure to foresee the gap it was leaving, i.e., Congress did not foresee that it lacked power under the Indian commerce clause to abrogate state sovereign immunity and that, therefore, its own statutorily prescribed tribal remedy of a federal court suit would prove to be ineffectual. Congress's lack of foreknowledge that the IGRA would prove to be devoid of any constitutionally effective tribal remedy does not suggest in the slightest that Congress anticipated or intended that the Secretary would default in his duty to prescribe an alternate remedial procedure to carry the IGRA into effect.

As with the general authority statutes, the role of the Interior under the specific delegations of authority under the IGRA is far broader than what Chief

Judge Jones's opinion, focused as it is on a narrow section of the law, admits. The IGRA authorizes the Secretary to approve or disapprove Tribal-State compacts according to whether a compact complies with or violates the IGRA, federal law or "the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B). Further, the IGRA specifically provides that "[i]f the State does not consent ... to a proposed compact submitted by a mediator ..., the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures ... which are consistent with ... the relevant provisions of the laws of the State...." 25 U.S.C. § 2710(d)(7)(B)(vii) (emphasis added) Thus, the IGRA contemplates that the Secretary of the Interior, and not the federal or state courts or a mediator, shall perform the task of interpreting state and federal laws and treaties to assure that a proposal or compact for Indian gaming complies with them. Additionally, the Secretary is given powers to review and approve or disapprove any plans by tribes to distribute revenue from gaming to members of a tribe, and to evaluate such plans for whether they comply with the IGRA's goal of tribal economic development. See 25 U.S.C. § 2710(b)(3)(B).

Moreover, a number of regulatory powers are delegated to the Secretary of the Interior through the National Indian Gaming Commission ("NIGC"), a three-member body within the Department of the Interior. Tamiami Partners

v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1048 (11th Cir. 1995); Seneca-Cayuga Tribe v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, 1023 (10th Cir. 2003). Two of the three members of the NIGC are appointed directly by the Secretary of the Interior. Tamiami, 63 F.3d at 1048. Congress plainly intends the Department of the Interior to have broad authority over gaming in enacting the IGRA, delegating to the NIGC the power to close an Indian gaming facility permanently, to adopt regulations governing fines, to issue subpoenas, to inspect the books and records of a Class II gaming facility, and to hold hearings. Id. The NIGC is required to "monitor class II gaming continuously, inspect class II gaming premises, promulgate regulations necessary to implement IGRA, and conduct background investigations of, among others, management contractors." Id. While the NIGC is technically a distinct entity within the Department of the Interior, the Secretary retains majority control over the board by appointing two of its members. It is plain that the nominal separation of the two does not change the clear intent of Congress to locate rulemaking and administrative authority under the IGRA with the Secretary of the Interior. Indeed, after the Tenth Circuit attempted to restrict the powers of the Interior by holding that the IGRA delegated determinations of what constituted a reservation to the NIGC, Sac & Fox Nation of Missouri v. Norton, 240 F.3d 1250 (10th Cir. 2001), Congress immediately corrected the court and clarified that the Secretary of the

65

Interior holds this power. City of Roseville v. Norton, 348 F.3d 1020, 1029-30 (D.C. Cir. 2003); Department of the Interior and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63, § 134 (2001).

In view of all of the foregoing, it is "apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law" with respect to any gaps or ambiguities in the IGRA. Mead, 533 U.S. at 229. Chief Judge Jones's contention to the contrary is based on a narrow reading of a particular statutory provision, exactly the kind of analysis forbidden by the Supreme Court. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) (holding that "a reviewing court should not confine itself to examining a particular statutory provision in isolation").

## VI.

Chief Judge Jones also incorrectly maintains that, under step two of the Chevron analysis, the Secretarial Procedures regulations do not reasonably effectuate Congressional intent with respect to the IGRA. Contrary to the suggestion of Chief Judge Jones's opinion, the Secretary's regulations are not only consistent with the intentions of Congress but are necessary to achieve the intended "finely-tuned balance" that Seminole revealed Congress had unintentionally failed to provide.

66

The IGRA was enacted with more than the interests of the states in mind. It was enacted "in large part to 'provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'" TOMAC, Taxpayers of Mich. Against Casinos v. Norton, 433 F.3d 852, 865 (D.C. Cir. 2006) (quoting 25 U.S.C. § 2702(1)). It was also designed to ensure that a tribe was the primary beneficiary of any gaming operations. Citizens Exposing Truth About Casinos v. Kempthorne, ___ F.3d ___, No. 06-5354, 2007 WL 1892080, at *1 (D.C. Cir. Jul. 3, 2007). "IGRA was designed primarily to establish a legal basis for Indian gaming as part of fostering tribal economic self-sufficiency, not to respond to community concerns about casinos...." Id. at *10; San Manuel Indian Bingo and Casino v. N.L.R.B., 475 F.3d 1306, 1308 (D.C. Cir. 2007) (holding that the purpose of the IGRA was to ensure economic development and self-sufficiency of Indian tribes through gaming).

While Congress did, as Chief Judge Jones asserts, intend that the mechanism to introduce gaming would be a tribal-state compact, it did not intend to allow, as the Seminole-blunted statute does, a situation in which states could refuse to negotiate and thus veto a tribal-state compact. Under the IGRA as passed by Congress, a state that failed to act in good faith, as Texas indisputably has here, could be sued in federal court. 25 U.S.C. § 2710(d)(7).

67

That state would have the burden of proving that it negotiated in good faith. Id. at 2710(7)(B)(ii). If the state failed to meet its burden of proof, it would have been ordered to negotiate a compact within 60 days. Id. at 2710(7)(B)(iii). If the state continued to refuse to compact, it would have been forced into mediation. Id. at 2710(7)(B)(iv). If the state ultimately refused to consent to the results of the mediation, the Secretary of the Interior was empowered to bypass the state and create its own procedures authorizing gambling by the tribe, consistent with the compact proposed during mediation. Id. at 2710(7)(B)(vii).

It was thus not just the existence of a compact that was crucial to the balance between states and tribes under the IGRA. "It is quite clear from the structure of the statute that the tribe's right to sue the state is a key part of a carefully-crafted scheme balancing the interests of the tribes and the states. It therefore seems highly unlikely that Congress would have passed one part without the other, leaving the tribes essentially powerless." Spokane Tribe, 139 F.3d at 1300. The right to sue to essentially force a compact gave tribes a crucial piece of leverage against the states - preventing a state from taking the approach of Texas in this case, which has been to utterly refuse to negotiate. Prior to the promulgation of the Secretarial Procedures regulations, states had under Seminole's constitutional interpretation a veto over the tribal-state compact process. See Matthew L.M. Fletcher, Bringing Balance to Indian Gaming, 44

68

HARV. J. ON LEGIS. 39, 75 (2007) (describing the stalemate resulting from the elimination of Congress's intended remedy for tribes faced with a state refusing to negotiate). "Congress did not intentionally create this situation and would not have countenanced it had it known then what we know now." Spokane Tribe, 139 F.3d at 1302.

Chief Judge Jones's opinion gives lip-service to the deference accorded under Chevron at step two to the Secretary's Procedures regulations, noting correctly that we may not disturb the agency's decision "unless it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned." Chevron, 467 U.S. at 845. We do not ask whether the Procedures regulations are ideal, or whether there is some way they can be improved. Mead, 533 U.S. at 229 (holding that "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise"). We do not ask whether Congress would have modified them in some minor way. We ask only whether they were reasonable and whether Congress would have sanctioned them. Chevron, 467 U.S. at 845. To focus on the minutiae, as Chief Judge Jones's opinion does, distracts from the general intentions of Congress in passing the IGRA: Congress intended to allow Indian gaming to proceed, for the purpose of economically benefitting Indian

tribes, after a negotiating process that would give states a right to negotiate towards the ultimate outcome. In the case of a state that attempted to halt or veto this process without good faith, Congress intended that tribes would ultimately be able to force gaming even over the objections of the state. The Secretary's regulations at issue here may not be perfect, but by allowing tribes an alternate process to propose gaming procedures in cases where a state refuses to negotiate and refuses to be sued in federal court, they closely approximate what Congress likely would have intended, while the status quo after Seminole undisputedly subverts the national legislative aims in respect to Indian affairs and relations.

Even on its discussion of the details, Chief Judge Jones's opinion is misguided. It first argues that the Procedures are unreasonable because they eliminate the requirement that a federal court determine whether the state has negotiated in good faith. But this criticism based on the idea that the Secretary's regulations deny the State of Texas access to an impartial federal court fact-finder rings hollow given that the Secretary's alternate remedy regulations are triggered only if the state has asserted its Eleventh Amendment right not to be sued in federal court by an Indian tribe under the original statutory procedures enacted by Congress. 25 C.F.R. § 291.3. Under the Secretary's alternate remedy regulations, a state that prefers that a federal court resolve its dispute with the

tribe may simply choose that option, waiving its objection to federal jurisdiction and proceeding exactly as Congress originally intended. The State of Texas, after categorically refusing to negotiate with the Kickapoo and after asserting its sovereign immunity in federal court when the Kickapoo attempted to invoke the original statutory procedures, now resorts to a federal court complaining that it is crucial that a federal court serve as an independent body to determine whether its absolute refusal to negotiate constituted "negotiations in good faith." The Procedures do not deny a state its right to a judicial determination as to whether it acted in good faith, because the state may choose to submit to a federal court's jurisdiction by allowing a tribe to sue it there; just as it has in the present case by bringing this suit in federal court. That Texas is well aware that a fair and impartial federal court would be unlikely to find that its utter refusal to negotiate amounted to good-faith bargaining does not obviate its undisputed right to litigate that matter in federal court.

Moreover, Congress contemplated the "good faith" determination as an affirmative defense, with the burden on the state to prove that it negotiated in good faith. 25 U.S.C. § 2710(d)(7)(B)(ii). The Secretary's alternate tribal remedy regulations require that the tribe has negotiated with a state for a six-month period prior to invoking the Secretarial Gaming Procedures. 25 C.F.R. § 291.3(b). A state must also have asserted its sovereign immunity defense against a suit

by the tribe. Id. at 291.3(d). The Procedures give the state a 60-day comment period, and invite it to submit an alternate gaming proposal. Id. at 291.7(b). They invite the state to participate in an informal conference with the tribe. Id. at 291.8(b). Only after mediation may the Secretary attempt to actually impose a proposal over the state's objection. Id. at 291.11. It seems unlikely that a state, negotiating in good faith, would fully proceed through this process without coming to some agreement with the tribe. A good faith determination might improve these procedures from a policymaking perspective, but that question is not one for this court under Chevron. We ask only whether the Secretary's regulations are reasonable and whether Congress would have sanctioned them - and it seems unlikely, given the Congressional goal of allowing and promoting lawful Indian gaming businesses, that Congress would not sanction these regulations closely tracking and complementing the original statute, rendered ineffective by Seminole, with an alternate remedy that is absolutely essential to its having the Congressional effect intended.

Chief Judge Jones's second contention is that the Secretarial Gaming Procedures regulations create a biased mediation process by allowing the Secretary of the Interior, rather than a court, to appoint a mediator who has "no official, financial, or personal conflict of interest with respect to the issues in controversy." 25 C.F.R. § 291.9(a). Chief Judge Jones's suggestion that the

Interior is placed in the role of an "objective arbiter" is incorrect - instead, the person appointed as a mediator is the fair and impartial decider. Unfounded speculation that the Secretary might not perform his plain duty under the statutes and his own department's regulations to select a neutral mediator fails to justify a conclusion that the regulations are unreasonable - especially given that for Chief Judge Jones's fears to materialize, not only must the Secretary violate his duty, but the neutral mediator must as well.

Chief Judge Jones's third contention, that the Secretary is enabled to simply disregard the mediator's proposal, exaggerates the Secretary's powers under the Procedures. The Secretary may not establish his own procedures unless he does not approve the mediator's proposal. The Secretary may not disapprove the mediator's proposal unless it violates federal or state law, violates the trust obligations to the tribe, or does not comply with the technical requirements of a proposal. 25 C.F.R. § 291.11. In the event that the Secretary disapproves, he may prescribe his own procedures - but only if they "comport with the mediator's selected proposal as much as possible...." Id. at 291.11(c). This differs only slightly from the statutory requirement that the procedures be "consistent with the proposed compact selected by the mediator...." 25 U.S.C. § 2710(d)(7)(B)(vii). Moreover, it is unclear which of the two is the more restrictive

on the Secretary - and the regulations certainly do not grant "unbridled power to prescribe Class III regulations."

Chief Judge Jones's final argument combines her previous three into a grand *petitio principii*. That is, she begs the question by contending that Congress would not have expected the Secretary to fill the unforeseen gap it left in the IGRA's tribal remedy unless he included the requirements that made it unintentionally unenforceable in the first place---a federal court's determination of a state's failure to bargain in good faith, the participation of a federal court-appointed mediator, and gaming procedures consistent with a federal court-appointed mediator's proposed compact. Yet we are not inquiring into whether Congress "intended" or could foresee the result reached by the Secretary in filling Congress's own unforeseen and unintended gap. We instead ask whether the result is a reasonable one that Congress would <u>sanction</u> by the agency it had empowered to make rules and policies to effectuate its acts regarding Indian affairs and relations for purposes of complementing or filling the gap in the statute. <u>Chevron</u>, 467 U.S. at 845. Congress intended for recalcitrant states to be subjected to suit by Indian tribes in federal court - but that intended tribal remedy was frustrated by the unforeseen constitutional interpretation in <u>Seminole</u>. I conclude that, if Congress had known that it lacked power to abrogate state sovereignty under the Indian commerce clause, it obviously would

have adopted at least some alternate form of remedy - and that it would likely have enacted something similar to the Secretarial Gaming Procedures regulations, as a reasonable and necessary alternate tribal remedy. Otherwise, if this reasonable and practicable proposition cannot be laid, we are faced with a preposterous alternative conclusion, viz., that Congress would have declined to adopt the IGRA in any form or would have included a veto power for hostile states in a statute designed "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[3] 25 U.S.C. § 270(1).

---

[3] Chevron is not the only potential source of deference owed to the regulations. The Indian canon of construction provides that because of the trust relationship between the federal government and the tribes, statutes "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 269 (1992) (quoting Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985)). The precise relationship between this canon of construction and the Chevron doctrine has not been resolved. Several circuits, however, have held that when the two principles of deference are in conflict, the Indian canon trumps the Chevron doctrine, requiring deference to the interpretation that is most favorable to the Indian tribes. See Scott C. Hall, The Indian Law Canons of Construction v. The Chevron Doctrine: Congressional Intent and the Unambiguous Answer to the Ambiguous Problem, 37 CONN. L. REV. 495 (2004); Cobell v. Norton, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (holding that the Indian canon prevailed over the Chevron doctrine when the two were in conflict).

There is no need to ponder the precise relationship of the two principles in this case, however, because they are not in conflict but concurrently call for judicial deference toward the Secretary's gaming procedures regulations that are necessary to carry the IGRA into full effect. Thus, at a minimum, the Indian canon adds substantially to the level of deference owed to the Secretary's Procedures regulations in this case. Chief Judge Jones makes unwarranted assumptions about the intent of Congress that are not

## VII.

In sum, this reviewing court has no business rejecting the Secretary's exercise of his generally conferred authority to fill a particular statutory gap simply because it deems the Secretary's chosen resolution to be unwise, but instead is obliged to accept the Secretary's position because Congress has not spoken to the point or gap at issue here and the Secretary's interpretation is reasonable. Further, the circumstances here imply that Congress would expect the Secretary to be able to speak with the force of law, even though Congress may not have expressly delegated authority or responsibility to implement a particular provision; the power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. The Secretary therefore acted within his authority to promulgate regulations filling an unanticipated statutory gap under the explicit authority of 25 U.S.C. §§ 2 and 9 and the implicit authority of the IGRA, and his ensuing regulations are owed <u>Chevron</u> deference and are binding in the courts because they are not procedurally defective, arbitrary or capricious in substance,

---

consistent with the obvious gap it unintentionally left in the IGRA along with the requirement that we generously construe any regulation by the Secretary to fill it in favor of the IGRA's effectuation, and with IGRA's furtherance of tribal economic development and self-sufficiency in light of Congress's unique trust relationship with the Indians.

or manifestly contrary to the statutes.  Accordingly, I DISSENT.